Cuyahoga Falls Education Association, Appellant, *v.* Cuyahoga Falls City School District Board of Education, Appellee.

[Cite as *Cuyahoga Falls Edn. Assn. v. Cuyahoga Falls City School Dist. Bd. of Edn.* (1991), 61 Ohio St.3d 193.]

(No. 90–1113—Submitted March 13, 1991—Decided July 31, 1991.)

*Green, Haines, Sgambati, Murphy & Macala Co., L.P.A., Ronald G. Macala* and *Anne Piero Silagy,* for appellant.

*Whalen & Compton Co., L.P.A., G. Frederick Compton, Jr., R. Brent Minney* and *Patricia A. Hill,* for appellee.

*Means, Bichimer, Burkholder & Baker Co., L.P.A., Robert T. Baker, Kimball H. Carey* and *Amy J. Girvin,* urging affirmance for *amicus curiae,* Ohio School Boards Association.

HOLMES, J.  The principal issue in this case is whether the Board properly implemented a reduction-in-force pursuant to the collective bargaining agreement between the Board and the Association.  For the reasons which follow we find the Board's action was in accord with the collective bargaining agreement.

In Article XII of the collective bargaining agreement the parties agreed that under certain conditions the Board could implement a reduction-in-force. Thus, pursuant to Article XII(A) of the parties' agreement:

"1.  Teachers shall not be discharged or laid off pursuant to a necessary reduction in personnel unless there is a *decrease in the number of students enrolled in the school district* or there is a decrease in the revenues of the school district.

"2.  The School Board shall notify and consult with the Association President regarding the nature of and specific reasons for any anticipated staff reduction at least (60) days before any non-renewal notices are mailed.

"3.  Teachers whose jobs are in jeopardy shall be notified of the anticipated layoff in writing no later than April 1.

"4.  When a reduction in staff is deemed unavoidable, such reduction will not be effectuated until the beginning of the following school year, unless there is an appropriate reduction as a result of a resignation of a staff member.

" * * *

"6.  Provisions.

" * * *

"j.  The official date for a teacher being placed on RIF shall be the date of official notification of the Board of Education action delivered by the Director of Personnel or his/her designee."  (Emphasis added.)

The Association asserts in its first and third propositions of law that this court should construe the reduction-in-force provision in light of the interpretations given to similar language contained in R.C. 3319.17,[2] which is to be narrowly construed against the Board.  We disagree.

---

2.  R.C. 3319.17 provides in situations where there is a reduction-in-force contemplated that:
   "When by reason of decreased enrollment of pupils, return to duty of regular teachers after leaves of absence, or by reason of suspension of schools or territorial changes affecting the district, a board of education decides that it will be necessary to reduce the number of teachers, it may make a reasonable reduction.  In making such reduction, the board shall proceed to suspend contracts in accordance with the recommendation of the superintendent of schools who shall, within each teaching field affected, give preference to teachers on continuing contracts

The issue before this court is the construction to be given to the reduction-in-force provision in the parties' collective bargaining agreement. In *Phillips v. South Range Local School Dist. Bd. of Edn.* (1989), 45 Ohio St.3d 66, 543 N.E.2d 492, this court was presented with a reduction-in-force case that was governed solely by R.C. 3319.17. There was *no* evidence of a collective bargaining agreement provision addressing a possible reduction-in-force. The *Phillips* court stated that "R.C. 3319.17 is a special statute which enables a board of education to suspend teachers' contracts for a decline in enrollment, which is totally unrelated to the teachers' performance." *Id.* at 67, 543 N.E.2d at 494. Moreover, the *Phillips* court reasoned that the purpose of the Teachers' Tenure Act, R.C. Chapter 3319, was to provide teachers with some degree of job security, and, therefore, R.C. 3319.17 was intended to be construed narrowly against boards of education due to the fact that certain due-process requirements contained in R.C. 3319.16 were relaxed. *Id.* at 68, 543 N.E.2d at 494.

Clearly, *Phillips* is distinguishable from the case at bar. Here, there is a collective bargaining agreement negotiated between the parties which has its own reduction-in-force provision. There is no authority for narrowly construing the language of the parties' agreement against the Board as was the case in *Phillips*.[3] In fact, we are bound by R.C. Chapter 4117 to follow the language of the agreement [4] and recognize that the parties stand on equal

---

and to teachers who have greater seniority. Teachers, whose continuing contracts are suspended, shall have the right of restoration to continuing service status in the order of seniority of service in the district if and when teaching positions become vacant or are created for which any of such teachers are or become qualified."

3. It is interesting to note that the negotiated agreement between the parties provides for a specific reduction-in-force to take place in the case of declining enrollment or a decrease in revenues. Moreover, the agreement mandates that the number of teachers with *continuing* contracts be reduced according to the procedures contained in R.C. 3319.17 (Article XII[A][5][e]), but there is *no* corresponding measure for the reduction of the number of teachers with *limited* contracts. Thus, the express language of the agreement indicates a desire to follow the statutory procedure for reducing the number of continuing contract teachers, but in the case of limited contract teachers the agreement will control.

4. R.C. 4117.10(A) explicitly provides in part that:
"*An agreement between a public employer and an exclusive representative entered into pursuant to Chapter 4117. of the Revised Code governs the wages, hours, and terms and conditions of public employment covered by the agreement.* * * * Where no agreement exists or where an agreement makes no specification about a matter, the public employer and public employees are subject to all applicable state or local laws or ordinances pertaining to the wages, hours, and terms and conditions of employment for public employees * * *. *Chapter 4117. of the Revised Code prevails over any and all other conflicting laws, resolutions, provisions, present or future,* except otherwise specified in Chapter 4117. of the Revised Code or as otherwise specified by the general assembly. * * *" (Emphasis added.)

footing with one another. As the court stated in *State, ex rel. Rollins, v. Cleveland Hts.–University Hts. Bd. of Edn.* (1988), 40 Ohio St.3d 123, 127, 532 N.E.2d 1289, 1293–1294, "collective bargaining is not a one-way street. We are not inclined to emasculate collective bargaining in public school employment. * * * [O]ne side cannot be released from the bargain while the other side is bound. By providing that the contract governs conditions of employment, the General Assembly has indicated its preference for enforcing those terms of an agreement which were arrived at through open negotiation at the bargaining table, regardless of which party is advantaged." See, also, R.C. 4117.22. Thus, a fair reading of *Rollins* indicates that unless otherwise excepted by R.C. 4117.10(A), provisions in a collective bargaining agreement arrived at mutually should not be narrowly construed against either party. Instead, when parties to a collective bargaining agreement have negotiated a provision pertaining to wages, hours, or terms and conditions of employment and there is a conflict either with the express language or the judicial interpretation given to a similar provision of the Revised Code, the interpretation of the agreement prevails. Consequently, in this case it is the collective bargaining agreement, not R.C. 3319.17, which controls the reduction-in-force procedure used by the Board.

In the case *sub judice* the official annual student enrollment leading up to the reduction-in-force by the Board was:

| Year | Enrollment |
|------|-----------|
| 1983 | 6,564 |
| 1984 | 6,358 |
| 1985 | 6,251 |
| 1986 | 6,110 |
| 1987 | 6,036 |
| 1988 | 6,087 |

The undisputed facts are that notice was given to the affected teachers in March 1988 pursuant to Articles XII(A)(3) and IX(D)(2)(a) of the parties' agreement. And, the Board implemented its reduction-in-force on April 26, 1988, by approving a resolution to nonrenew the limited contracts of twenty-two teachers. By April 30, 1988, all the nonrenewal notices had been received by the affected teachers.

---

Accordingly, R.C. 4117.10(A) provides that collective bargaining agreements *prevail* over laws in conflict with the agreements. We observe that provisions in collective bargaining agreements detailing the procedure for reducing the number of employees due to declining enrollment clearly govern wages, hours, and terms and conditions of employment within the meaning of R.C. 4117.10(A). Consequently, the provisions in the collective bargaining agreement here or in any case pertaining to a reduction-in-force will prevail over R.C. 3319.17, unless the statute falls within one of the exceptions listed in R.C. 4117.10(A). And, for purposes of this case none of the exceptions has been invoked. See, *e.g., State, ex rel. Rollins, v. Cleveland Hts.–University Hts. Bd. of Edn.* (1988), 40 Ohio St.3d 123, 532 N.E.2d 1289.

In applying the facts to the parties' agreement it is apparent that the reduction became effective on July 1, 1988. This conclusion is premised on Article XII(A)(4), which specifies that a " * * * reduction will not be effectuated until the beginning of the following school year * * *," and R.C. 3313.62, which provides:

"The school year shall begin on the first day of July of each calendar year and close on the thirtieth day of June of the succeeding calendar year. * * * " [5]

Nowhere in the parties' agreement is there language which provides that teachers may not be discharged or laid off unless there is a *continuing* decline. Instead, Article XII(A) of the agreement only requires a mere "decrease in the number of students enrolled." In reviewing the enrollment patterns from 1983 until the reduction-in-force was processed in school year 1987–1988, we find that there was more than an eight percent decline in enrollment, without any increases. The only increase observed was in 1988 *after* the Board already took action for the October 1987 decrease in enrollment as provided in Article XII of the parties' agreement. Apparently, the Association would have the Board wait until October of the school year following the year in which it notified the teachers of the potential layoff before it would actually lay off the teachers, notwithstanding the fact that teacher assignments are made on or about August 1 under the parties' agreement. See Article IX(A)(1)(a) of the collective bargaining agreement. It should be noted that even though the reason for the reduction-in-force was evident in January 1988 and the mandated process began that same month, the Board was contractually barred from implementing the needed staff reductions until the next school year (*i.e.,* 1988–1989).

Accordingly, in reviewing the Board's action in light of the express terms of Article XII of the parties' collective bargaining agreement, we find the reduction-in-force was properly implemented.

The Association advances the argument in its second proposition of law that the court of appeals was bound by the law of the case doctrine. We summarily overrule this proposition since the court of appeals' treatment of a teacher under a continuing contract in a companion case was premised solely on R.C. 3319.17, as mandated by Article XII(A)(5)(e) of the parties' collective bargaining agreement. The court of appeals in the present case held with respect to this issue:

---

5. We note parenthetically that the parties reserved the right to establish the school calendar prior to March 1 of each year. See Article XIII(B) of the collective bargaining agreement; see, also, 1968 Ohio Atty.Gen. Ops. No. 68–156, at 2–191.

" * * * [I]f one carefully reads the opinion, it can be seen that this court addressed only that section of the collective bargaining agreement as it applied to a teacher holding a continuing contract and the order of recall as it relates to seniority and filling a vacancy by a person holding proper certification in finding that the collective bargaining agreement was patterned after R.C. 3319.17. In fact, Article XII, Section A(5)(e) of the collective bargaining agreement mandates that continuing contract teachers shall be reduced according to R.C. 3319.17. Any expansion of our reasoning in the companion case as it related to our interpretation of Article XII, Section (A)(6)(c) is improper under the facts of this case."

Accordingly, for the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., WRIGHT and H. BROWN, JJ., concur.

SWEENEY, DOUGLAS and RESNICK, JJ., dissent.

SWEENEY, J., dissenting. Since I believe that the court of appeals below impermissibly re-weighed the evidence presented to the trial court and merely substituted its judgment for that of the trier-of-fact, I must dissent from the majority opinion herein.

Given the language of the majority's second syllabus paragraph, one would assume that the instant collective bargaining agreement conflicts with R.C. 3319.17. The majority trumpets its holding by proclaiming that where a conflict exists in situations of this type the collective bargaining agreement prevails. However, a clear reading of both the statute and the agreement reveals no conflict whatsoever. Moreover, the agreement itself fails to define all its terms, including what precisely constitutes a "decrease in the number of students enrolled" that would permit a reduction-in-force in the school district. The majority intimates that the agreement defines such phrase. However, the definition embraced by the majority is simply the interpretation advanced by appellee school board and its supporting *amicus curiae;* it is nowhere to be found in the four corners of the collective bargaining agreement.

When using terms of art in the collective bargaining context, courts should not ignore peculiar statutory language that is used in certain collective bargaining agreements. If the reduction-in-force herein was truly based upon a "decrease in the number of students enrolled," then one wonders why the school board waited so long to implement the reduction-in-force, especially in light of the findings of the trial court that enrollment in the school district had increased in 1988.

Given the fact that Article XII of the collective bargaining agreement readily appears to have been patterned after R.C. 3319.17, I believe that the trial court correctly referred to such statute in construing the terms of the agreement. As Justice Herbert Brown noted in the majority opinion of *Whitley v. Canton City School Dist. Bd. of Edn.* (1988), 38 Ohio St.3d 300, 301–302, 528 N.E.2d 167, 169:

"Absent contractual language to the contrary it may be assumed that, when a word or phrase from a statute is utilized in a teaching contract, the parties are presumed to intend the meaning given to such words or phrases by the statute. *Jacot v. Secrest* (1950), 153 Ohio St. 553, 42 O.O. 31, 93 N.E.2d 1; *Banks v. DeWitt* (1884), 42 Ohio St. 263, 274; *Stow Teachers Assn. v. Stow Bd. of Edn.* (1981), 2 Ohio App.3d 82, 2 OBR 91, 440 N.E.2d 827."

The majority rationalizes its holding by stating: "Nowhere in the parties' agreement is there language which provides that teachers may not be discharged or laid off unless there is a *continuing* decline." However, such rationalization does nothing more than parrot the interpretation urged by appellee and its supporting *amicus curiae.* The mere fact that the majority must make such a declaration exemplifies the inherent ambiguity within the collective bargaining agreement and its susceptibility to differing interpretations. If the collective bargaining agreement was intended to permit layoffs for "mere" decreases in school enrollment as the majority preaches, then where is the word "mere" to be found in this particular agreement, and how can the majority blithely ignore the statutory source upon which the disputed language is based? Once again, the question remains that if the reduction-in-force was so badly needed by the school board, why did it wait until enrollment *actually increased* in 1988 when it implemented the instant reduction-in-force?

Contrary to the majority's intimations, the collective bargaining agreement in issue was not developed in a vacuum and should not be interpreted as such. A clear reading of the agreement makes it obvious that it was patterned after the language contained in R.C. 3319.17. Under these circumstances, this court's decision in *Phillips v. South Range Local School Dist. Bd. of Edn.* (1989), 45 Ohio St.3d 66, 543 N.E.2d 492, is directly on point with respect to the cause *sub judice.* Instead, the majority casts *Phillips* aside in an apparent attempt to justify a pre-determined result.

Given the majority's linguistic gymnastics and its utter disregard of prior binding precedent issued by this court in reduction-in-force cases, teachers' associations would be well advised to keep today's majority opinion in mind when negotiating future collective bargaining agreements in order to ensure enforcement of the letter, spirit and purpose of the Ohio Teacher Tenure Act.

Unwittingly, or perhaps not, the majority has needlessly added a certain measure of mistrust in the so-called "equal footing" process of collective bargaining between teachers and school boards.

Since the appellee school board failed to adhere to the terms of the collective bargaining agreement in light of both R.C. 3319.17 and *Phillips, supra,* I would reverse the decision of the court of appeals below and reinstate the sound judgment of the trial court.

DOUGLAS and RESNICK, JJ., concur in the foregoing dissenting opinion.